At this time, would Attorney Andrews please introduce himself on the record to begin? Good morning, Judge Cata, Judge Montecavo, Judge Helpe. My name is Robert Andrews. I request that I be allowed two minutes for rebuttal in this panel. Yes, you may have two minutes. May it please the Court, the problem in this case is the lack of reasonable or articulable suspicion to justify the lengthening of the detention that occurred on the highway in the early morning hours in the middle of winter shortly after a snowstorm had concluded. And how long do you think this intervention should have taken place, like seven minutes, eight minutes, or, you know, versus what time it started? I mean, so it's not the time that matters, right? We know that now. It used to be the time that mattered. How long was it extended? Now it's not. It's whether it's reasonable based on the extent of reasonable articulable suspicion. And here we're looking at nothing that connects the people on the side of the highway with the main state troopers' suspicion that they were involved in drug trafficking. Within a very short time of experiencing these people, he had returned to his cruiser and had made a phone call to his superior. Well, you talk about detention. I didn't see where he was detaining them. We're talking about a car in an accident on the side of the main turnpike in the snow in the winter. Was he supposed to leave them there? Well, so – I would be – we'd have a tort claim of him if he left them there. Well, he wouldn't have left them there. So you're not talking about him detaining there any longer. You're talking about him continuing an investigation rather than terminating the investigation and just chatting with them. Well, I believe that while it's not explicit, he didn't say, I'm detaining you, right? What he said was, would you like to sit in my cruiser to stay warm? And shouldn't we encourage police officers to be so kind? And we should, right? I mean, it's necessary, particularly on the side of the road in a relative – I mean, it's not in an urban area. It's in a rural area. And we should encourage that, right? It's necessary in our state or in my state. We're not in Maine. I forget that sometimes. But it's necessary, but it also is being used as an excuse. And that's what we're seeing here, right? We're seeing it as a way of making Ms. Howard feel like this isn't really a problem for me. What she says is, I'd like to call and get a ride. And what the trooper responds with, we'll talk about that later if we get there. And the reason he says that is because he's hedging his bets, right? He's already made the conclusory statement to his sergeant, I'm 100% certain that these people have a load of drugs and that they're transporting drugs in this car. But what he – if I understand it, what he had was he had a car that he determined was not registered. That is correct. And he had – it also had no insurance. That is correct. It was required by Maine law. He got inconsistent statements from the passengers in the car as to where they were going and what they were doing. That is correct. And then one of them gave them a fake name and a fake date of birth. And when they finally tracked it down and got to the bottom of it, as they're standing out there on the side of the road, he finds out there's a warrant for that passenger. That is correct. You're saying that that's not enough for him to continue suspecting that maybe he has a crime going on here? Well, if we were talking about resolution of a valid suspicion, you'd be absolutely correct. The problem is, is there's no valid suspicion. When you hear those facts, you don't start scratching your head saying, something's going on here. I don't. And the reason that I don't do that, Your Honor, is because I'm in tune with specifically how Trooper Van De Steen sold this to Sergeant Pappas, right? And the reason that I'm in tune with that is because he doesn't say, right, I have three people and they're from New York, right? And I have three people who have told me stories that show that they know each other, right? And I point to that specifically because one of the things in this situation was the trooper had concluded that they didn't know each other, and that was a reason to support his drug trafficking conclusion. What do you make of the passing the phones back and forth? The government brief discusses this, and I think you can see it on one of the videos, that the Ms. Howard and the car's driver pass phones back and forth. Do you think that should figure into our reasonableness? So, I think that it's important to understand that most people have a cell phone. And it's also important to understand that these people didn't have any obligation to speak to the police. And maybe they didn't want to. Well, is that exactly right? Because their car is, you know, they're in a car that's in a single car accident. So, they have some obligation to speak to the police. Well, I guess the driver had some obligation. And the question is, does some passenger who it's well established by this point that Ms. Howard wasn't driving, does she have an obligation to speak to the police beyond saying, I'm Yolanda Howard? I'm still trying to figure out what you're saying the police did wrong. They didn't keep them there. They didn't put them there. They didn't tell them they couldn't leave. And the problem for you is that the officer asked your client if the officer could look in her purse. She said yes. He looked in the purse and found the drugs. How do you – you would need to establish, it seems to me, either he could not ask the question, it was unlawful to ask the question, or you would need to establish that she didn't consent. How do you establish that he couldn't ask the question? So, I established that he couldn't ask the question because there's no connection between these people and drug trafficking beyond his hunch. Right? The problem here is that he's describing – well, I break down his reasonable articulable suspicion into three aspects. The first is they're traveling from New York. The second is that it is two Caucasian – or three Caucasian-appearing people and one person who's non-white in appearance. And he's focused on that fact when he's calling Sergeant Pappas, asking for the full panoply of police assets to come and respond, which of course is what they do. And the question is, is that reasonable? Is that justified based on what Trooper Vandersteen and Trooper Keene knew at that time? And the answer to that is no. It doesn't take five cruisers to respond to a traffic accident where there aren't any injuries and someone has just slipped off the road. And that's what happened. But they decided that they were going to do the full panoply of police assets. And what they did is when they weren't having much luck, they had already allowed Ms. Howard to sit in the cruiser, having patted her down once, that they pulled her out and said, no, we need to do it again. And the reason we need to do it again is because Sergeant Pappas had arrived and said, I want her searched more thoroughly. And that is the problem here. And so – and if you'll just allow me to finish my answer. You could finish your sentence or two. Yeah. That is the problem. That's what extends the search, the detention, the investigation. And I think it's relevant to her consent in the sense that she shouldn't have been there at all. And second, she didn't really want to. And in fact, there were troopers who recognized she didn't want to give up that bag. Thank you, Mr. Andrews. You have reserved time for your rebuttal. Thank you. Thank you. At this time, Attorney Kleinbold, if you could – Kleinbord, if you could please introduce yourself on the record to begin. Yes, good morning. Brian Kleinbord on behalf of the United States. And may it please the Court. Your Honors, my principal argument in this case is that the District Court properly found that there was a voluntary consent to search Ms. Howard's bag at the accident scene. That argument is a question of fact that's reviewed for clear error. And in this case, that standard of review takes on even greater importance because the District Court's finding on consent in this case was based principally on Ms. Howard's express verbal consent, which was in turn based on demeanor-based credibility evaluation of the trooper's testimony. So Ms. Howard will not be able to demonstrate clear error on what I think is the core issue in this case, which is her consent to search the bag in which the drugs were found. The other issues in this case I think are subsidiary, but important to understand the scene that was unfolding and why the troopers took the actions that they took. And the first is that Ms. Howard was not unreasonably detained during the course of this investigation until the drugs were recovered and she was then placed under arrest for possession with intent to distribute the narcotics. The suggestion was just made that she was told she couldn't call for someone to come pick her up. Yes. I don't believe that's a fair reading of the record, Your Honor. The testimony on that is at page 150 of the suppression record. And what Trooper Loader actually testifies to, this is on cross-examination, Trooper Loader says, I believe she said I have somebody that can come get me. It's important to remember that Ms. Howard had her cell phone the entire time throughout this investigation and was able to use it freely. So he says, I believe she said I have somebody that can come and get me. And then the follow-up question from Ms. Howard's counsel is, excuse me, and then the testimony continues, I said we'll talk about that when we get to it. Not, we'll talk about that later if we get to that. It was, I said we'll talk about that when we get to it. And then the next question is from opposing counsel, all right, so at that moment you confirmed that she wasn't free to leave. And Trooper Loader responded, no. I said when she, and then the court interjects and stops and says ask another question, ask an appropriate question. So that issue wasn't really developed. Obviously, it appears that trial counsel was trying to demonstrate that through his answer Trooper Loader was suggesting that she was not free to leave. And I don't think that that's a fair reading of the record on that point. So again, what we have here is not a traffic stop. If it were a traffic stop, obviously the driver and the occupants would have been seized under the Fourth Amendment. We don't have that here. Did you argue to the district court that this was not a stop? No, that wasn't the primary argument. You didn't argue it at all, though, did you? Me personally? Not you, I mean the government. No, no, the argument, the government responded to Ms. Howard's argument that the police did not have reasonable articulable suspicion and the consent issue. I think the case law obviously supports the principle that this court could affirm or reach another ground if it's adequately supported by the record. And so that's why I raised the issue that even before we get to the question of whether reasonable suspicion was there or required, we need to, did a seizure even occur? And I don't think that opposing counsel really precisely identifies when a seizure occurred in this case. Yeah, but to get it clear, the lower here is not alleging this is an auto stop? I'm sorry, Your Honor. You're not claiming this is an automobile stop? No, no, no, no, certainly not. The troopers happened to see right after this crash occurred that a car had... Let me also ask, when the bag is going to be opened, one of the arguments defense counsel makes on appeal is that Ms. Howard was a special ed student. She has a very low level of intelligence. Is there anything in the record that an objective, reasonable officer intervening with her would suspect, you know, I can't get a consent from her to open the bag because of that? I believe I've looked at the record. There's no indicia that she had lesser intelligence than an average person, correct? That's correct, Your Honor. There were no facts developed at the suppression hearing. So even if she did, an average, you know, reasonable police officer would have acted the way he did like any other person? Yes, that's correct. I mean, Ms. Howard interacted with the troopers for quite some time during this accident investigation, and their interactions were polite and the police officers were professional and courteous, and there were no indication that when she did consent, when she said, yes, you can open the bag, that that was the product of coercion or her not understanding what was going on. Can I circle back to the reasonable suspicion analysis if that's the analysis we decide to engage in? Other than the occupant's lack of familiarity with each other, their vague travel stories, I'm not sure they're inconsistent, but they are vague, and the defendant's initial distancing herself from the officer. She's on her cell phone. She's walking away from the cars. What other facts, are there any other facts pertaining to Ms. Howard that we should be considering in terms of a reasonable suspicion analysis? Well, I think all of the facts impact Ms. Howard even if they're not observations specifically about Ms. Howard. It's about the suspicion is that one or more of the occupants of the car or the car itself contains drugs, and so there's a lot more about what the officers gleaned from talking to the occupants of the car. It's not just that their stories weren't lining up. They didn't know one another. The troopers asked about, you know, who are you traveling with, and Ms. Howard didn't even know the names of the other occupants in the car, and this was, you know, they were traveling from out-of-state to Maine some distance, so the fact that they don't know each other's names is highly suspicious. In addition, the driver of the car did not have registration or insurance paperwork. The male passenger initially gave the police a fake name and date of birth, and then through further investigation, they determined that he had two active arrest warrants, and then, as you say, the observations about Ms. Howard herself were that she was the only one who was distancing herself from the officers, and she was on her phone. She appeared to be, in the officer's view, deleting, perhaps deleting text messages or texting with other members of the car,  considered in their totality were certainly enough to constitute a reasonable, articulable suspicion. Let me ask you, if we were to find in this case that, based on these facts, the officers could not continue to investigate, as a matter of precedent, I assume this would also affect other investigative scenarios, for example, other types of accidents that officers then can't go investigate or find other information, or dwelling burns, you know, you can't intervene with the people. That would have that effect, am I correct? Yes. Certainly, I think the distinction that the court needs to draw in this case is that the police officers were not on the clock or the time limitations that they are necessarily guided by when they conduct a traffic stop. These officers were, well, certainly they had suspicions almost from the outset that there might be drug trafficking involved. They're not, they got to the scene for a very different purpose, and that was to investigate a car accident. But they, and again, that's the last thing, you said they did not target this car or its passengers, they didn't stop the car and start, you know, there was an accident and they did what probably any other officer should do, correct? That's correct, that's correct, Your Honor. And I assume if they didn't do that, you know, probably they'd get reported back at headquarters and, you know, somebody, you know, take administrative action for not, for failing to act. Yes, as we, as the government cited in our brief, they had a statutory obligation to investigate the accident once they came upon it. And so I see that my time... Can I just ask a really quick factual question? There are two women in the car. Yes. I can't figure out, and I'm just wondering if you know the answer, Paulson is the driver. How many times was she patted down or searched for officer safety? Well, I don't know that the record reflects that. But I would say that she wasn't treated differently. The troopers were inviting all, it was eight degrees outside, and they were inviting all of the people to sit inside a warm cruiser. The record doesn't really reflect what other actions the troopers made. Were the other individuals charged or just Ms. Howard was the only one charged? Well, I know that the male passenger was arrested because of other warrants. But in this particular case, the suppression hearing, the only one present there was, as a defendant, was Howard, correct? Yes, correct. So facts as to the defendants, it would have been hard to develop unless somebody for some reason raised them. That's exactly right, Your Honor. Yes. It's not like there's four and the four asking questions crossing the nation. No, it was only Ms. Howard who was involved in the suppression hearing. Unless the court has any further questions, I thank the court. Thank you. Thank you. Thank you. At this time, if Attorney Andrews would please reintroduce himself on the record to begin this rebuttal. Robert Andrews for Yolanda Howard. It's not my reading of the record, Your Honors. It was Judge Singel's reading in the district court. On his order on page four, he says, while loaders searched her bag, Howard was unrestrained and front passenger drawer, sorry, stood open and he responded, we will talk about that if we get to that point. That's there in his order. That was his finding. And given that that was his finding, I think that it's clear that there's some indication that there was a reason for Ms. Howard to feel like she couldn't leave, particularly having asked to find her own ride. How much time passed between that conversation and the purse search? I want to say ten minutes. Is there any evidence that anyone could have been there had she called in fewer than ten minutes? Well, I think she was communicating with what they say is her erasing. I think is her, I don't know that it could have been there within ten minutes. I don't know that. But someone was communicating with her. So if she couldn't have left in fewer than ten minutes, then how can it be said that she was detained longer by the officer? Well, so... In a relevant sense to the search? You're right in the sense that she agreed to get into that car, right? And she allowed to be padded down for officer safety. And she was there sitting there and it wasn't until Sergeant Pappas arrived and said, no, no, we're doing this again. And then they called another female trooper to come and do that search. That's the difference here. This isn't, oh, we're doing our public safety function here. I want to make one other point. And that's the reliance on the idea that they didn't know each other. So this court in many opinions has said that people who are dealing drugs aren't just merely present. And to the court that has always been a common sense which cuts directly against the idea that people who didn't know each other would be involved in drug trafficking. And that from my perspective is why there's really only one factor and that's that they were out of state that could legitimately have informed reasonable articulable suspicion. Thank you, Your Honor. Thank you, Mr. Andrews.